**AFFIDAVIT OF RESIDENT AGENT IN CHARGE ROBERT J. BOSKEN,**
**U.S. DEPARTMENT OF VETERANS AFFAIRS,**
**OFFICE OF INSPECTOR GENERAL,**
**IN SUPPORT OF A COMPLAINT**

I, Robert J. Bosken, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Resident Agent in Charge with the U.S. Department of Veterans Affairs ("VA"), Office of Inspector General ("OIG"). In my current position, I am responsible for the supervision of several VA OIG Special Agents as well as the investigation of criminal offenses affecting the VA. I have worked as an investigator for the VA OIG since 2010. Prior to joining the VA OIG, I was employed as a Special Agent with the U.S. Postal Service, OIG for approximately six years. During my approximately fifteen-year federal law enforcement career, I have received extensive law enforcement training, including specialized training concerning the investigation of drug diversion. My training has included completing the Federal Law Enforcement Training Center's Criminal Investigator Training Program, the U.S. Drug Enforcement Administration's Basic Narcotics School, and the New England State Police Information Network's Pharmaceutical Diversion Training.

2. In addition to my training, I have directed investigations involving embezzlement, theft, tampering, health care fraud, and drug diversion. I have participated in numerous drug investigations as a case agent and in a subsidiary role. With exposure to drug-related cases, I have become familiar with the appearance and packaging of drugs as well as methods and techniques used to illegally divert controlled substances. I have debriefed more than 100 defendants, informants, and witnesses who had personal knowledge about drug diversion and other criminal activities. I have personally participated in several aspects of drug diversion

investigations, including conducting surveillance, using cooperating witnesses, conducting interviews, reviewing records, and utilizing undercover law enforcement agents. During my law enforcement career, I have also participated in the preparation and/or execution of numerous search warrants.

3. This affidavit is submitted in support of a criminal complaint charging Kathleen Noftle ("NOFTLE") with obtaining a controlled substance by misrepresentation, fraud, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3), and tampering with a consumer product, in violation of Title 18, United States Code, Section 1365(a)(4).

4. This affidavit is based on my own personal involvement in this investigation, my training and experience, and my discussions with other law enforcement officers involved in this investigation. In submitting this affidavit, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause to charge NOFTLE with the offense of obtaining morphine, a schedule II controlled substance, by misrepresentation, fraud, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3), and tampering with a consumer product, specifically morphine, a schedule II controlled substance, in violation of Title 18, United States Code, Section 1365(a)(4).

## INVESTIGATION

5. The VA Medical Center in Bedford, Massachusetts, also known as the Edith Nourse Rogers Memorial Veterans Hospital ("VAMC"), is a VA-operated medical facility located at 200 Springs Road in Bedford, Massachusetts. The VAMC provides multiple services to veterans of the U.S. Armed Forces, including hospice and palliative care. Veterans receiving

hospice and palliative care services from the VAMC are in-patients who live and are treated in a section of the VAMC commonly known as Ward 2C, the David James Hospice Wing, or the Hospice Unit ("Hospice Unit").

6. During the course of this investigation, I have reviewed VAMC records and interviewed VAMC employees, including NOFTLE. I have learned the following information:

7. NOFTLE was hired by the VAMC as a full-time registered nurse on March 22, 2015. Prior to being hired by the VAMC, NOFTLE previously worked as a registered nurse for Tewksbury Hospital for approximately twenty-nine years.

8. NOFTLE was assigned to the VAMC's Hospice Unit where she primarily worked the Hospice Unit's "evening shift", which covered four o'clock in the afternoon to midnight.

9. Hospice Unit employees are assigned to one of two medication carts.[1] Each medication cart is intended to be used to transport and administer medication to patients on one side of the unit. Therefore, in assigning an employee to a medication cart, the employee assumes responsibility for the patients on the corresponding side of the Hospice Unit.

10. According to VAMC records, on Friday, January 13, 2017, NOFTLE worked the evening shift, from four o'clock in the afternoon to midnight.

11. On Saturday, January 14, 2017, after NOFTLE completed the evening shift, a VAMC Hospice Unit employee ("Employee-1") found two small red colored caps containing a blue colored liquid in a patient's ("Patient-1") medication cassette.[2] Employee-1 recognized the small red colored cap as a cap that is used at the VAMC to seal the end of an oral medication

---

[1] A medication cart is a mobile unit that nurses push from one patient to another during their medication pass. VAMC medication carts contain cassettes, with the patients' names on front, which are loaded into the medication cart. These individual cassettes contain the medication that each patient is to receive during the medication pass.
[2] Patient-1 was a Hospice Unit in-patient who has since passed away.

syringe, including the syringes used to administer liquid morphine to patients on the Hospice Unit.

12. Employee-1 showed her discovery to the charge nurse ("Employee-2"). Both Employee-1 and Employee-2 immediately suspected the blue colored liquid contained within the caps was liquid morphine. Morphine, including liquid morphine, is a schedule II controlled substance. Morphine is intended for the treatment of pain, but it can be abused. Employee-1 and Employee-2's identification of the blue colored liquid as morphine was based on their training, experience, and belief that liquid morphine was the only blue colored liquid on the unit.[3]

13. When interviewed by law enforcement, Employee-1 said she immediately noted that NOFTLE usually treated the patient in whose cassette Employee-1 had found the caps with the suspected morphine. Employee-1 said she was not suspicious but confused; she assumed the medication had been refused by a patient and was not properly wasted.

14. VAMC protocol generally required that unused controlled substances be wasted in a particular bin with a witness. Believing the blue colored liquid was an unused controlled substance, Employee-1 and Employee-2 wasted the suspected drug in accordance with hospital protocol.[4]

15. According to VAMC records, on Saturday, January 14, 2017, NOFTLE worked the evening shift, from four o'clock in the afternoon to midnight.

16. On Sunday, January 15, 2017, Employee-1 and Employee-2 again worked a Hospice Unit shift immediately after NOFTLE. According to Employee-1, after NOFTLE's

---

[3] Chlorhexidine Gluconate Oral Rinse, described as a "mouth wash", was another blue colored liquid used on the Hospice Unit.
[4] Law enforcement agents were unable to test the blue colored liquid because it was wasted.

shift ended and NOFTLE had left work, Employee-1 checked Patient-1's medication cassette and discovered three more red colored caps containing a blue colored liquid.

17. Employee-1 again showed her discovery to Employee-2. Both Employee-1 and Employee-2 suspected the blue colored liquid was morphine. When interviewed by law enforcement, Employee-1 said she immediately knew something was "wrong" upon making this second discovery. Employee-2, however, said she believed NOFTLE had left the morphine behind to be wasted. Employee-2 said she suspected NOFTLE was responsible for the morphine because on both days (January 14, 2017 and January 15, 2017) NOFTLE was assigned to the patient (Patient-1) in whose medication cassette the drug had been found. Believing it to be a wasting issue, instead of a diversion issue, Employee-1 and Employee-2 again wasted the suspected drug in accordance with hospital protocol. Employee-1 and Employee-2 notified their administrative coordinator ("Employee-3"), and later sent separate emails to the nurse manager ("Nurse Manager") documenting their findings.

18. On Sunday, January 15, 2017, NOFTLE worked the evening shift, from four o'clock in the afternoon to midnight. Employee-3 later told the VAMC and law enforcement that after NOFTLE arrived for her evening shift, Employee-3 confronted NOFTLE about the red colored caps containing a blue colored liquid that had been found earlier that day. NOFTLE reportedly stated that she had given a patient a partial medication dose and left the remainder of the mediation in the caps. NOFTLE reportedly explained to Employee-3 that she wanted the veteran to be more cognizant when the veteran's family visited and forgot to partially waste the remaining medication. Believing NOFTLE's conduct was being addressed by another employee, Employee-3 allowed NOFTLE to continue working her assigned January 15, 2017 shift at the VAMC.

19. On Monday, January 16, 2017, after NOFTLE had completed her scheduled evening shift, a VAMC Hospice Unit employee ("Employee-4") opened a patient's ("Patient-2") medication cassette and found a single red colored cap filled with a blue colored liquid.[5] Patient-2's cassette was in a medication cart that NOFTLE did not use, as it was assigned to her co-worker. Employee-2 was alerted to Employee-4's discovery of the suspected morphine. Employee-2 informed Employee-4 that suspected morphine had been discovered on January 14, 2017 and January 15, 2017 in Patient-1's medication cassette.

20. Employee-4 took digital pictures of the red colored cap containing the suspected morphine and used an oral syringe to measure the quantity of liquid contained in the cap. The pictures Employee-4 took of the red colored cap and the oral syringe used to measure the blue colored liquid were later provided to me. The following is an image of the cap and one of the oral syringes:

 

21. Employee-4 also contacted the VA Police Service ("VAPS") and showed the suspected morphine to a VAPS officer. When later interviewed by law enforcement on February 15, 2018, Employee-4 said he/she told the VAPS officer that the blue colored liquid looked like

---

[5] Patient-2 was a Hospice Unit in-patient who has since passed away.

morphine.⁶  After speaking with VAPS, Employee-2 and Employee-4 wasted the blue colored liquid.⁷

22. In a January 16, 2017 email to the Nurse Manager, Employee-2 documented Employee-4's discovery in Patient-2's medication cassette.  In the email, Employee-2 wrote that the discovery "…makes it a total of 6 caps over weekend with solution in them."

23. On January 19, 2017, VAPS referred this matter to VA OIG for investigation.  At the time of the referral, NOFTLE was reportedly aware of the investigation and was out of work sick.

24. On January 23, 2017, VA OIG Special Agent Brendan Callanan ("SA Callanan") and I interviewed NOFTLE.  NOFTLE denied ever diverting any medication from the VAMC.  NOFTLE said she heard some of the blue colored liquid was discovered in her medication cart, but also heard some of the liquid was discovered in her co-worker's medication cart.  NOFTLE did not have any explanation for why the liquid was discovered in her medication cart, other than that she did not typically secure her medication cart and her cart was "messy".  I verbally warned NOFTLE about the possible penalties associated with lying to federal agents and provided NOFTLE with my contact information.

25. On January 27, 2017, NOFTLE met with the Nurse Manager to discuss the suspected morphine that had been found in her medication cart.  NOFTLE told the Nurse Manager that she had already been questioned by two investigators about this issue and again denied diverting any medication from the VAMC.  Immediately following the conversation, the Nurse Manager documented this conversation in a report of contact.

---

⁶ A February 3, 2017, VAPS report documented that Employee-4 initially told the responding officer he/she did not know what the blue colored liquid was.
⁷ Law enforcement agents were unable to test the blue colored liquid because it was wasted.

26.     On January 31, 2017, NOFTLE contacted the Nurse Manager via telephone. NOFTLE reported that she was not truthful about the diversion of morphine when they spoke on January 27, 2017. NOFTLE reportedly told the Nurse Manager that she was responsible for the morphine found in her medication cart on January 14, 2017 and January 15, 2017. NOFTLE reportedly said she was also responsible for the morphine found in her co-worker's medication cart on January 16, 2017. NOFTLE explained that she hid the morphine in her co-worker's medication cart to divert attention from herself. NOFTLE said the medication found in her cart was a result of carelessness and not drug diversion. NOFTLE told the Nurse Manager that she was going to contact law enforcement and be truthful. Immediately following this conversation, the Nurse Manager documented this conversation in a report of contact.

27.     NOFTLE later sent the Nurse Manager an email reiterating the admissions she made during their telephone conversation. NOFTLE wrote, in part, "I am responsible for putting diluted medication in the caps into the medcart. The 3rd day I placed one in another cart to try to get the focus off myself. I am sorry about this. I am a better person than the behavior I displayed leads you to believe."

28.     On January 31, 2017, SA Callanan and I interviewed NOFTLE. NOFTLE said she was responsible for the morphine that was discovered in the medication carts on all three days. NOFTLE acknowledged that she "planted" liquid morphine in her co-worker's medication cart with the purpose of diverting attention from herself. After initially denying that she had diverted the drugs for personal use, NOFTLE admitted she had addiction issues and began to divert drugs from the VAMC approximately two months prior. NOFTLE said she either ingested drugs that patients had refused or diluted drugs she administered to patients. NOFTLE explained she mixed water from the sink with a portion of the patient's liquid morphine then

administered the diluted medication to the patient orally. NOFTLE said she then ingested a diluted amount of the remaining drug.

29. According to NOFTLE, the blue colored liquid discovered in her medication cart was diluted liquid morphine that she diverted and intended to ingest. According to NOFTLE, the morphine found in her medication cart on January 14, 2017 and January 15, 2017 was intended to be administered to "Patient-3".[8]

30. Further investigation revealed that NOFTLE falsified VAMC records to conceal her drug diversion.

31. According to VAMC records, during her January 13, 2017 shift, NOFTLE used her unique user identification and password to retrieve liquid morphine from the hospital's OMNICELL unit on seven occasions (totaling eighty milligrams) to administer to Patient-3.[9] NOFTLE scanned Patient-3's wrist band on seven separate occasions, thereby purporting to give the patient a total of eighty milligrams of liquid morphine.[10] Additionally, NOFTLE wrote a note within Patient-3's medical record that documented the times and amounts she reportedly gave liquid morphine to Patient-3.[11] In fact, as she later admitted, NOFTLE had diverted a portion of that drug and gave the remainder to Patient-3 as a diluted substance. These false entries not only concealed NOFTLE's drug diversion, they created a false medical record that reported Patient-3 received more morphine than Patient-3 in fact had received.

---

[8] Patient-3 was a Hospice Unit in-patient who has since passed away.

[9] The VAMC uses a comprehensive automated medication management machine, commonly referred to by its trademark name "OMNICELL", to permit access to controlled substances by nurses, and to secure the drugs. All information regarding the nurse, patient, drug, and date/time are recorded within the OMNICELL machine.

[10] The VAMC uses a software system called the Bar Code Medication Administration, commonly referred to as "BCMA", to track medication given to a patient. When a nurse gives mediation to a patient, the nurse scans a barcode on the patient's wristband to verify the patient's identity. The nurse then scans a barcode on the medication to verify the medication was administered and the dose. This information is then stored and can be generated later, via online records.

[11] The VAMC uses a computer-based patient record system called the Centralized Patient Record System ("CPRS"). CPRS allows a healthcare provider to manually enter a narrative into the patient's electronic record.

32.     According to VAMC records, during her January 14, 2017 shift, NOFTLE used her unique user identification and password to retrieve liquid morphine from the hospital's OMNICELL unit on three occasions (totaling twenty milligrams) to administer to Patient-3. NOFTLE scanned Patient-3's wrist band on three occasions, thereby purporting to give Patient-3 a total of twenty milligrams of liquid morphine.  Additionally, NOFTLE wrote a note within Patient-3's medical record that documented the times and amounts she reportedly gave liquid morphine to Patient-3.  In fact, as she later admitted, NOFTLE had diverted a portion of that drug and given the remainder to Patient-3 as a diluted substance.  These false entries not only concealed NOFTLE's drug diversion, they falsely indicated that Patient-3 received more morphine than Patient-3 in fact had received.

33.     I have reviewed VAMC records and learned that after being notified of NOFTLE's admissions to law enforcement, VAMC staff conducted a chart review of Hospice Unit patients treated by NOFTLE.

34.     I have learned during my investigation that dyspnea, or difficulty breathing, is a common symptom of patients who are in the final stages of life.  This feeling of suffocation can be identified by a trained clinician by noting a patient's facial expression, mouth and nasal movement, and chest rise.  I have also learned that hospice patients are often prescribed morphine to treat these symptoms and reduce suffering.

35.     Patient-3, whom NOFTLE specifically mentioned in her confession, was identified as a patient who appeared to have been harmed by NOFTLE's drug diversion and tampering.  According to VAMC records, on January 14, 2017, Patient-3's respirations were noticeably elevated despite NOFTLE recording that the patient had been given eighty milligrams of liquid morphine over an approximate six-hour period.  Approximately thirty minutes after

NOFTLE's shift ended at midnight, another Hospice Unit nurse recognized signs that Patient-3 was in distress, noting Patient-3's "furrowed brow", elevated respiratory rate, and "shallow" breathing.  Patient-3 was subsequently given a fifteen milligram dose of morphine—significantly less than the dose NOFTLE claimed she had administered—as well as another medication, and Patient-3's condition improved.  Patient-3 died approximately one day later, on January 16, 2017.

36.     Based on VAMC's review of Patient-3's records, VAMC determined NOFTLE's admitted drug diversion and tampering may have caused increased dyspnea for Patient-3 and increased his suffering.  As a result of these findings, following Patient-3's death, VAMC notified Patient-3's family that Patient-3's end-of-life comfort may have been negatively impacted.

37.     Based on my training, experience, and information I have learned during this investigation, I believe that the liquid morphine at issue affected interstate commerce.

38.     The liquid morphine sold to VAMC during this time-period was supplied by SPECGX LLC ("SpecGx").  SpecGx sent the liquid morphine from St. Louis, Missouri to McKesson Corporation ("McKesson"), in Methuen, Massachusetts.  McKesson then delivered the drugs to the VAMC in Bedford, Massachusetts.  To pay for the drugs, VAMC sent payment from a VA account located in Charlotte, North Carolina to a McKesson account located in Irving, Texas.

39.     During her interview with law enforcement, NOFTLE admitted to diverting liquid morphine from the VAMC for approximately two months prior to being confronted in January 2017.  Evidence of NOTFLE's admitted drug diversion was discovered on January 14, 2017, January 15, 2017, and January 16, 2017.  VAMC records report that the hospital ordered eighty-

11

five bottles of liquid morphine on January 18, 2017 from McKesson, and another forty bottles of the drug on January 26, 2017.

40. As part of the investigation, I also questioned NOFTLE about the circumstances of her departure from Tewksbury Hospital, before she was hired by the VAMC. During an initial interview of NOFTLE on January 23, 2017, she stated that she left because of the ending of a romantic relationship. Records subsequently obtained from the Massachusetts Department of Public Health revealed that NOFTLE had agreed to resign from Tewksbury Hospital in lieu of a disciplinary proceeding that could have resulted in her termination. These records showed that NOFTLE had been charged with failure to follow appropriate procedures when wasting narcotics on 60 occasions, placing patient safety in jeopardy. She was placed on a "last-chance" agreement, but narcotics were then discovered in her medication cart where they did not belong.

## PROBABLE CAUSE

41. Based on the foregoing, and based on my training and experience, I submit that there is probable cause to believe that, on or about January 13, 2017; January 14, 2017; and January 15, 2017, Kathleen NOFTLE committed violations of federal law by obtaining morphine, a schedule II controlled substance, by misrepresentation, fraud, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3), and tampering with a consumer product, specifically morphine, a schedule II controlled substance, in violation of Title 18, United States Code, Section 1365(a)(4).

_____
Robert J. Bosken
Resident Agent in Charge
VA Office of Inspector General

Sworn and subscribed to before
me this 17th day of September, 2019.

_____
HON. JUDITH G. DEIN
United States Magistrate Judge
District of Massachusetts